# In the Iowa Supreme Court

No. 24–0769

Submitted September 10, 2025—Filed December 23, 2025

**State of Iowa,**

Appellee,

vs.

**Lynn Melvin Lindaman,**

Appellant.

Appeal from the Iowa District Court for Polk County, Charles C. Sinnard (motion to suppress) and David Nelmark (trial), judges.

The defendant appeals from his conviction for sexual abuse in the second degree, and the State cross-appeals seeking review of the district court's order suppressing evidence of the defendant's confession. **Affirmed in Part, Reversed in Part, and Case Remanded.**

McDonald, J., delivered the opinion of the court, in which Oxley, McDermott, and May, JJ., joined. Oxley, J., filed a concurring opinion, in which McDermott, J., joined, and Waterman, J., joined as to part I. Waterman, J., filed a dissenting opinion, in which Christensen, C.J., joined. Mansfield, J., took no part in the consideration or decision of the case.

Lucas Taylor (argued) of LT Law, Des Moines, for appellant.

Brenna Bird, Attorney General, and Louis S. Sloven (argued), Assistant Attorney General, for appellee.

**McDonald, Justice.**

Lynn Lindaman was convicted of sexual abuse in the second degree, enhanced, in violation of Iowa Code sections 709.3(1) and 901A.2(3) (2023), arising out of the abuse of his granddaughter. We address five issues raised in this direct appeal and cross-appeal from that conviction. First, whether there is sufficient evidence to sustain the conviction. Second, whether Lindaman's state constitutional right to confront the witnesses against him was violated when the district court allowed the complaining witness to testify at trial via one-way closed-circuit television. Third, whether the district court erred in concluding that the marital communications privilege did not preclude Lindaman's former spouse from testifying about the statements Lindaman made to her after he was confronted with the allegation that he abused his granddaughter. Fourth, whether the investigating officers violated Lindaman's statutory right to make a phone call to a family member, an attorney, or both without unreasonable delay upon arrival at the place of detention. Fifth, whether the investigating officers violated Lindaman's right to the assistance of counsel when they questioned Lindaman after he requested to have a lawyer present.

I.

This case concerns the conviction of Lynn Lindaman for the sexual abuse of his seven-year-old granddaughter, H.K. On June 27, 2023, H.K. and her brother rode their bikes to visit their grandparents, who lived nearby. Lindaman was there alone. H.K. testified she liked cats, and she liked playing with her grandparents' cats. While her brother was in a different room, H.K. asked Lindaman to give her a belly rub like a kitten. She said to him, "Meow, I want a belly rub." She testified that Lindaman started to rub her belly and then "he got a little low." He told her to take off her clothes. She felt like she was being forced;

she took off her skirt and underwear. She testified that Lindaman touched her vagina with his hand. He rubbed "it in a circle" with his fingers. She testified that, while this was occurring, she heard her brother's footsteps approaching where she and Lindaman were. The sound of her brother's approaching footsteps caused an interruption. She testified that she then said she was "done with this" and put her clothes back on. She testified that she and Lindaman then went into the kitchen. Lindaman said, "Don't tell anyone about this, especially your mother." She thought, "[T]hat's suspicious." She and her brother then went home.

Later that evening, H.K., her parents, and her siblings went to Lindaman's house to visit, as they frequently did. H.K.'s parents picked up food from a local food truck and walked to the Lindamans' home. The children, including H.K., had biked ahead of them. When H.K. got to the house, she asked Lindaman, "Do we have to keep this secret?" and he said, "Yes." She said, "Geesh." Later, while eating outside on the patio, H.K. told the group what had happened earlier in the day. She testified:

> My mind said, I can't hold this in. We should say it out loud. This is right. So I listened to my mind. While everyone was talking and eating, I sat next to my brothers, and I'm like, "Hey, everyone, stop what you're doing. Grandpa touched my private part." And then everyone was like, "Excuse me, what?" I'm like, "Grandpa touched my private part." My dad got up and threw the chair kind of across from him, and my dad was like, "What?"

Lindaman was inside the home when H.K. made her statement. H.K.'s father went inside the home and confronted Lindaman. H.K.'s father testified that Lindaman said, " 'Hold on,' or 'Let me explain,' something to that effect, and '[H.K.] was exploring her sexuality.' " H.K.'s father shoved Lindaman to the ground. After a moment, Lindaman got up and told H.K.'s parents to leave the house. They did, and they went home. Lindaman's wife, Anne, confronted

Lindaman after everyone had left the home. She testified, over Lindaman's objection, that Lindman admitted to "rubbing [H.K.'s] belly like a kitten." Lindman told Anne that "he was trying to help [H.K.] explore her sexuality in a safe place."

H.K.'s father, who was a police officer with the Ankeny Police Department, called his on-duty supervisor. Law enforcement officers arrived at his house, and H.K.'s parents reported the incident. Law enforcement officers obtained an arrest warrant. Because H.K.'s father was employed by the Ankeny Police Department, the Iowa Department of Public Safety, Iowa Division of Criminal Investigation (DCI), was asked to take the lead in the case.

Peace officers executed the arrest warrant the next day at an auto service center where Lindaman was getting his car serviced. They informed Lindaman they were investigating allegations made by H.K. and asked if he would talk. Lindaman replied, "I'd probably like to have my lawyer present." DCI Special Agent Laura Myers informed Lindaman he was under arrest and handcuffed him. At some point during this interaction, Lindaman asked if he could make a phone call to cancel a previously scheduled haircut appointment. The officers did not allow him to make the phone call because they had seized his phone as evidence. Another peace officer then told Lindaman, "If you at any time change your mind, and you wish to speak to us, we're willing to talk to you. Okay?" Lindaman asked, "If I talk to you now, . . . I don't have to go to the police station?" Special Agent Myers responded that he would still be under arrest and taken to the station regardless, reiterated that they would like to talk to him, but acknowledged that he had asked for an attorney. Lindaman then stated, "I can talk to you right now, I guess." The arresting officers told Lindaman to wait, and they transported him to the station.

Upon arriving at the station, Special Agent Myers and Ankeny Detective Betsy Anderson escorted Lindaman to a "soft" interview room. The room had a table, chairs, a loveseat, and an end table next to the loveseat. On top of the end table was a phone and a phone book. The officers asked Lindaman to have a seat, and he replied that he needed his handcuffs taken off. One of the officers asked Lindaman to turn away from her so she could take off his handcuffs. When Lindaman turned away, he faced directly toward the end table, phone, and phone book for the next forty seconds while the officer uncuffed him. After the officer uncuffed Lindaman, he sat on the loveseat within arm's reach of the phone and phone book.

After Lindaman was seated next to the phone, the second officer asked Lindaman if he needed anything. Lindaman stated, "I'd just like my phone to call my wife and cancel my appointment." Presumably, this referred to his previously mentioned haircut appointment. The officer told Lindaman, "You probably can't have your phone but you can definitely make a phone call, okay?" As the officer made the statement, she made a small gesture with her hands toward the phone on the end table next to Lindaman. Lindaman took no action.

After several seconds of silence while the officers were getting situated and looking through some papers, the officers engaged with Lindaman. One officer read him his *Miranda* rights. After being advised of his *Miranda* rights, Lindaman signed a written waiver of his rights and agreed to speak to the officers. Over the next hour, Lindaman gave a detailed, clinical confession. Lindaman explained that H.K. wanted a belly rub and that he gave her one. He stated that H.K. told him to go lower, "down there." He admitted to massaging H.K.'s genitals and rubbing her breasts.

When the officers concluded the interview, they left Lindaman in the soft interview room unattended for approximately fifty minutes. During that time, Lindaman sat and fidgeted. He turned the phone book and looked at the cover, but he never looked through it. He looked at the phone on the end table, but he did not try to make a phone call.

Lindaman was charged with sexual abuse in the second degree. The case was tried to a jury, but the jury did not hear evidence of Lindaman's confession. Prior to trial, Lindaman moved to suppress evidence of his confession on two grounds. First, he argued that he invoked his statutory right under Iowa Code section 804.20 to call counsel or a family member at the police station and that the officers did not honor that right by permitting him to make a call. Second, Lindaman argued that the officers violated his constitutional right to counsel by questioning him after he requested to have an attorney. The district court found that the officers violated Lindaman's statutory right to make a phone call but not his constitutional right to counsel. As a remedy for the statutory violation, the district court suppressed evidence of Lindaman's confession. Even without the confession, the jury found Lindaman guilty as charged.

Lindaman timely filed this appeal, and the State timely filed a cross-appeal. As noted above, we address five issues material to the resolution of this case. First, whether there is sufficient evidence to sustain the conviction. Second, whether the district court erred in allowing the complaining witness to testify at trial via one-way closed-circuit television. Third, whether the district court erred in allowing Lindaman's former spouse to testify about statements Lindaman made to her. Fourth, whether the investigating officers violated Lindaman's statutory right to make a phone call upon arrival at the place of detention. Fifth,

whether the investigating officers violated Lindaman's right to the assistance of counsel.

## II.

Lindaman challenges the sufficiency of the evidence supporting his conviction. This court reviews challenges to the sufficiency of the evidence for the correction of errors at law. *State v. Mathis*, 971 N.W.2d 514, 516 (Iowa 2022). In reviewing the sufficiency of the evidence, we are highly deferential to the jury's verdict. *State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021). The jury's verdict binds this court if it is supported by substantial evidence. *Id.* Substantial evidence is that quantum and quality of evidence sufficient to convince a rational trier of fact the defendant is guilty beyond a reasonable doubt. *See id.* In determining whether the jury's verdict is supported by substantial evidence, we view the evidence in the light most favorable to the State, including all legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence. *Id.*

Viewing the evidence in the light most favorable to the verdict, we find substantial evidence supports Lindaman's conviction. Where, as here, the defendant does not object to the marshaling instructions, the unobjected-to instructions are the law for the purpose of reviewing the sufficiency of the evidence. *Mathis*, 971 N.W.2d at 518. The jury was instructed that the State was required to prove: (1) "the defendant performed a sex act with H.K.," and (2) "[t]he defendant performed the sex act while H.K. was under the age of fourteen (14) years." The jury was instructed that the term "sex act," as relevant here, "means any sexual contact . . . [b]etween the finger or hand of one person and the genitals or anus of another person." H.K. testified to the specific act of sexual abuse and being under the age of fourteen at the time of the abuse. Under Iowa

law, an alleged victim's testimony need not be corroborated and can by itself constitute substantial evidence to sustain a conviction. *See* Iowa R. Crim. P. 2.21(3) ("Corroboration of the testimony of victims shall not be required."); *Mathis*, 971 N.W.2d at 519 (concluding the alleged victim's testimony itself was substantial evidence sufficient to sustain conviction). We conclude H.K.'s testimony is sufficient to sustain the conviction.

Although corroboration is not required, substantial evidence in the record does in fact corroborate H.K.'s testimony. H.K.'s father immediately confronted Lindaman after H.K. accused him of touching her, and Lindaman stated he was helping H.K. explore her sexuality. Lindaman told his wife Anne the same thing. H.K. underwent a physical exam the day after telling her parents about the alleged abuse. Nurse practitioner Jennifer Schossow testified H.K. had notable redness in the hymenal area consistent with digital penetration or rubbing, which was confirmed by photographic evidence.

Lindaman launches several attacks on H.K.'s credibility, arguing, among other things, that there was no physical evidence of the abuse, that there were no eyewitnesses to the abuse, that H.K.'s testimony was too specific to be authentic, and that H.K.'s testimony may have been influenced by the prosecutor or her parents. Lindaman misperceives our role. The jury is the sole arbiter of witness credibility. As we have said before, appellate review is "not the trial redux." *Mathis*, 971 N.W.2d at 519. "In considering a challenge to the sufficiency of the evidence, '[i]t is not the province of the court . . . to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury." *Id.* (alteration and omission in original) (quoting *State v. Musser*, 721 N.W.2d 758,

761 (Iowa 2006)). The jury weighed these matters and was entitled to find H.K.'s testimony credible. We will not second-guess the jury's credibility determination.

### III.

We next address Lindaman's state confrontation clause claim. Prior to trial, the State moved to allow H.K. to testify via closed-circuit testimony pursuant to Iowa Code section 915.38. As relevant here, that statute provides:

> Upon its own motion or upon motion of any party, a court may protect a minor, as defined in section 599.1, from trauma caused by testifying in the physical presence of the defendant where it would impair the minor's ability to communicate, by ordering that the testimony of the minor be taken in a room other than the courtroom and be televised by closed-circuit equipment for viewing in the courtroom. However, such an order shall be entered only upon a specific finding by the court that such measures are necessary to protect the minor from trauma.

*Id.* § 915.38(1)(*a*). Lindaman timely objected to the State's motion and argued that allowing H.K. to testify via closed-circuit television violated his right to confront the witnesses against him as protected by article I, section 10 of the Iowa Constitution. The district court overruled Lindaman's objection and granted the State's motion. Lindaman contends that this was reversible error.

Our recent decision in *State v. White*, 9 N.W.3d 1 (Iowa 2024), controls this issue. At the time the state constitution was adopted, the right of the criminally accused to confront the witnesses against him was a right to face-to-face confrontation with the witnesses. *Id.* at 7; *see also Coy v. Iowa*, 487 U.S. 1012, 1016 (1988) (explaining the Supreme Court has "never doubted" that the confrontation right "guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact."); *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987) ("The Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination."). In *White*, we concluded that

allowing a witness to testify against the defendant via one-way closed-circuit television violated the accused's state constitutional right to confront the witnesses against him. 9 N.W.3d at 9. That holding is controlling here.

The State concedes that *White* controls the outcome here, but it argues that this court should overrule *White*. The State first argues that the state constitutional *right* of the criminally accused to face-to-face confrontation of the witnesses against him is only a constitutional *preference*. *White* considered and rejected that argument, and we adhere to our prior decision; after all, article I of the Iowa Constitution is entitled "Bill of Rights," not "Bill of Preferences." Our founders believed that the criminal procedures in place during their time were so protective of liberty that they constitutionalized those procedures in a bill of rights to prevent the government from limiting those protections by ordinary legislation. In Iowa, the criminally accused must be informed of the accusation against him. Iowa Const. art. I, § 10. He is entitled to a copy of the charging document. *Id.* He is entitled to have the assistance of counsel for his defense. *Id.* He is entitled to a speedy and public trial. *Id.* He is entitled to a trial in front of an impartial jury. *Id.* He is entitled to have compulsory process to call witnesses for him at that trial. *Id.* And, as we explained in *White*, he is entitled to confront face-to-face the witnesses called against him at trial. *See id.*; *White*, 9 N.W.3d at 9.

Beyond contravening the confrontation clause, the procedure in section 915.38 is in significant tension, if not outright conflict, with a foundational principle of our criminal justice system: the constitutional presumption of innocence. The presumption of innocence is the "bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.' " *In re Winship*, 397 U.S. 358, 363

(1970) (quoting *Coffin v. United States*, 156 U.S. 432, 453 (1895)). "It is fundamental that every man is presumed to be innocent when placed on trial until proved to be guilty." *State v. Jones*, 144 N.W.2d 120, 122 (Iowa 1966) (quoting *State v. Burns*, 165 N.W. 346, 348 (Iowa 1917)). The defendant is entitled to that legal presumption "throughout the entire trial." *State v. Delanty*, 230 N.W. 436, 437 (Iowa 1930) (quoting *State v. Smith*, 224 N.W. 594, 594 (Iowa 1929)). "No presumption that he is guilty at any time exists." *Id.* (quoting *Smith*, 224 N.W. at 594) The nature of the case or the strength of the evidence against the defendant does not change the presumption. *State v. Meyer*, 163 N.W. 244, 247 (Iowa 1917). "The presumption of innocence is the same in all cases," and it "shields every person" whatever the nature of the case and despite the strength of the evidence against the accused. *Id.* Specifically, the defendant must "be presumed innocent of the fact—the act charged." *Andre v. State*, 5 Iowa (Clarke) 389, 398 (1857). Under our constitution, all criminal defendants are entitled to the same type of trial regardless of the strength of the evidence against them.

The district court, however, denied Lindaman the trial afforded to all other criminal defendants, and it did so precisely because it made a preliminary finding of guilt. The State called mental health counselor Amanda Rennolet in support of its motion to have H.K. testify outside Lindaman's physical presence. Rennolet testified that Lindaman had in fact abused H.K. and that the fact of abuse would cause H.K. to suffer trauma in Lindaman's physical presence. In an opinion letter admitted as an exhibit during the pretrial hearing on the State's motion, Rennolet opined that H.K. experienced trauma "as a result of the abuse," that she was a "victim of nonparental child sexual abuse," that testifying would increase H.K.'s risk of "posttraumatic stress disorder," that the sexual abuse would have "lasting effects regardless of when it occurred," that H.K. had a

"significantly higher risk of developing trauma because of the abuse," and that her "[h]ealthy boundaries" had been "fractured and broken" by "her own grandfather." The district court credited Rennolet's testimony and found H.K. would be traumatized by testifying in Lindaman's physical presence. The district court then ordered that there be a different type of trial in this case than in other criminal cases—the complainant would get to testify outside the physical presence of the accused and the jury—because it found before trial that Lindaman had in fact committed the crime charged.

The State argues that section 915.38 is not in tension with the presumption of innocence because the district court did not make a finding that abuse in fact occurred but instead made a finding that the alleged victim would be traumatized from being in the presence of the defendant. The State's distinction does not hold—implicit in a finding that a witness would be traumatized by being in the presence of the defendant is a finding that the defendant in fact committed the crime.

The State responds that a finding of guilt is not implicit because the victim may incorrectly believe that they were abused. When asked about this during oral argument, the State explained that section 915.38 does not require a finding that abuse occurred because it does not rule out the possibility that the victim believes the abuse occurred and is incorrect. In other words, according to the State, section 915.38 is not in tension with the presumption of innocence because it applies to the testimony of false accusers (persons who have not been the victim of any crime and leveled false charges for nefarious motives) and incorrect accusers (persons who may have been the victim of some act not constituting a crime or persons who have been the victim of a crime but identified the wrong person).

The State's argument is troubling when conjoined with the State's next argument for overturning *White*. In the State's view, allowing a witness to testify outside the presence of the defendant enhances the "ability to communicate (and testify)." According to the State, the witness would be relieved of the psychological pressures inherent to being in the physical presence of the accused and the jury, which would allow the witness to provide better, more convincing testimony. But what if the better, more convincing testimony was false or incorrect? Better, more convincing testimony is not the same thing as truthful or accurate testimony. In the case of false or incorrect accusations, per the State's argument, section 915.38 increases the risk of wrongful convictions by making the false or incorrect accusations more convincing.

Our founders recognized the very real risk of false testimony or incorrect testimony infecting a criminal trial, and they constitutionalized the right of face-to-face confrontation to guard against that specific risk:

> Only the combination of all of these elements of confrontation—including face-to-face testimony—fully protects a defendant's [right of confrontation].
>
> Our founders presumably believed that accusers would be more reluctant to make false accusations when they were in the personal presence of the accused. "A witness 'may feel quite differently when he has to repeat his story looking at the man whom he will harm greatly by distorting or mistaking the facts.'" Technology has changed since the late eighteenth century, but human nature has not.

*State v. Rogerson*, 855 N.W.2d 495, 504 (Iowa 2014) (citation omitted) (quoting *Coy*, 487 U.S. at 1019); *see also Coy*, 487 U.S. at 1017 ("[T]here is something deep in human nature that regards face-to-face confrontation between accused and accuser as 'essential to a fair trial in a criminal prosecution.'" (quoting *Pointer v. Texas*, 380 U.S. 400, 404 (1965))).

Our rules of constitutional criminal procedure are designed in the main to protect the innocent and minimize the prospect of wrongful conviction. Like our founders, we are not naïve of or indifferent to the costs of these protections. Constitutional rights designed to protect the innocent increase the difficulty of convicting the guilty. That is part of the constitutional design. The light of the constitution shines equally on the evil and the good and the just and the unjust. This choice reflects the "fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." *Schlup v. Delo*, 513 U.S. 298, 325 (1995) (quoting *In re Winship*, 397 U.S. at 372 (Harlan, J., concurring)). As this court long ago explained:

> To protect the innocent, and punish the guilty, are the two great objects to be kept in view in the administration of criminal jurisprudence. While, upon the one hand, the law will hold the offender to a strict accountability, it should, upon the other, extend to the accused all possible facilities for a fair, full, and impartial trial. And as the accused is always presumed innocent until convicted, no course should be adopted that would deprive him of that fair trial so humanely secured to him by law.

*Ray v. State*, 1 Greene 316, 318 (Iowa 1848).

The State makes another argument in favor of overruling *White*. The State argues *White* is bad policy because "*White* traumatizes victims *every single time* it applies." Factually, the argument rests on a false premise. The assertion that *White* inflicts trauma in "*every single*" case is incorrect for a variety of reasons. Most relevant here, as the State explained during oral argument, some cases involve false accusers who, presumably, would not actually be traumatized by giving false testimony in the defendant's presence. We do not suggest that this case is such a case, but the risk of wrongful conviction in this category of cases is nonetheless real. *See generally* Jessica S. Henry, *Smoke but No Fire: When Innocent People Are Wrongly Convicted of Crimes That Never Happened*, 55 Am.

Crim. L. Rev. 665 (2018) (examining data from the national exonerations database, discussing the distinction between wrongful convictions for a crime that actually happened and wrongful convictions for crimes that never occurred, and explaining that one third of exonerations involve the latter category, including false accusations of sex abuse).

Legally, the State's (and the dissenting opinion's) policy concern is not material to the constitutional question presented. We do not minimize the potential emotional distress a witness might suffer upon being required to confront a defendant to prosecute a crime, but this concern was known to the framers of our constitution, and they nonetheless decided upon confrontation as the critical mechanism for the exposure of false or incorrect criminal accusation. *See Rogerson*, 855 N.W.2d at 504. As judges, we are not at liberty to subordinate that constitutional determination to legislative policy preferences.

The state constitution is "the supreme law of the state, and any law inconsistent therewith, shall be void." Iowa Const. art. XII, § 1. More specifically, "This Constitution," i.e., the state constitution as adopted in 1857, is "the supreme law of the state, and any law inconsistent therewith, shall be void" *Id.* The original, fundamental law of the constitution as ratified by the people remains the law until amended. "The age of the Constitution may develop conditions which make it desirable to amend it; until amended, it is a holy covenant, which judges are not at liberty to emasculate by urging a species of statute of limitation." *Hunter v. Colfax Consol. Coal Co.*, 154 N.W. 1037, 1047 (Iowa 1915).

The original law of the 1857 state constitution binds the legislature in the same way it binds the judiciary:

> To make sure that there could be no dodging of the fact that the Constitution of the state is in all parts of its acts supreme, it is

provided in section 1 of article 12: "This Constitution shall be the supreme law of the State, and any law inconsistent therewith, shall be void. The General Assembly shall pass all laws necessary to carry this Constitution into effect."

Our Constitution makers wanted to make sure that this would be the rule adopted. It announced to the people, "We are turning the power of the State over to the legislature, but turning it over under the conditions named," and so when the Legislature passes any act inimical to any section of the Constitution, that Legislature is exceeding its power and its right, and is in the same position that any other agent would be, in exceeding power, i.e., have the act in excess of the power conferred declared void.

*Duncan v. City of Des Moines*, 268 N.W. 547, 553 (Iowa 1936); *see also C. C. Taft Co. v. Alber*, 171 N.W. 719, 720 (Iowa 1919) ("[T]he provisions of our Constitution are mandatory, and their mandates bind as closely and as firmly the legislative branch of the government as they do the citizen of the commonwealth. The legislative branch must obey the Constitution or fundamental law, and must follow and obey its requirements and directions."). "[I]n no conceivable case may the just judge give effect to legislation which clearly violates the fundamental law. None but foresworn judges will yield in these to any degree of necessity, or pressure of public opinion, or disregard the Constitution because it was created in the eighteenth or nineteenth century." *Hunter*, 154 N.W. at 1047.

For these reasons, we adhere to *White*. Section 915.38(1) clearly and palpably violates the fundamental law of the state constitution, and the district court erred in allowing H.K. to testify outside the defendant's presence. The State requests that we remand this matter for a harmless error determination. We decline to do so. Harmless error review is an appellate function used to determine whether relief is appropriate under the circumstances. *See Knowles v. State*, 848 So. 2d 1055, 1058 (Fla. 2003). We have conducted harmless error review, and

we conclude the error was not harmless. We thus remand this case for a new trial.

## IV.

Lindaman raises several additional issues in support of his claim that he is entitled to a new trial. Lindaman contends that he is entitled to a new trial due to prosecutorial misconduct. Specifically, he contends that the prosecutor and H.K.'s father improperly coached H.K. in preparing her testimony and that the prosecutor failed to timely disclose the allegedly improper coaching of H.K. Lindaman also contends the district court erred in denying his motion to change venue due to pretrial publicity. Additionally, Lindaman claims that the district court erred in denying his motion for a mistrial based on prior bad acts testimony. Because we have already concluded that Lindaman is entitled to a new trial, we need not address any of these additional issues. They are immaterial, are unlikely to reoccur on remand, or have already been remedied by the grant of a new trial.

## V.

We next address Lindaman's argument regarding the marital communications privilege. The district court allowed Lindaman's wife, Anne, to testify about the statements Lindaman made to her when she confronted him about the allegation of sexual abuse. Lindaman claims this conversation was a privileged marital communication not subject to any exception. Because this issue is material and likely to reoccur upon any retrial of this matter, we address it now. *See State v. Dudley*, 856 N.W.2d 668, 679 (Iowa 2014). "We review rulings on the admissibility of allegedly privileged communications for abuse of discretion. We review rulings interpreting a statutory privilege for correction of

errors at law." *Slaughter v. Des Moines Univ. Coll. of Osteopathic Med.*, 925 N.W.2d 793, 800 (Iowa 2019) (citation omitted).

Iowa Code section 622.9 generally prohibits married partners from testifying about confidential communications made between them during the course of the marriage. The statute provides, "Neither husband nor wife can be examined in any case as to any communication made by the one to the other while married, nor shall they, after the marriage relation ceases, be permitted to reveal in testimony any such communication made while the marriage subsisted." *Id.* The statute codifies a common law privilege grounded on the policy of encouraging free and open communication between spouses. *See Sexton v. Sexton*, 105 N.W. 314, 315 (Iowa 1905).

The marital communications privilege is not absolute. The legislature has determined that the public interest in protecting children from abuse outweighs the benefits of the marital communications privilege. Iowa Code section 232.74 thus establishes a statutory exception to the privilege for testimony "regarding a child's injuries or the cause of the injuries in any judicial proceeding, civil or criminal, resulting from a report pursuant to [chapter 232] or relating to the subject matter of such a report."

Because the spouse's testimony must result from or relate to the subject matter of a report of child abuse, those provisions defining child abuse limit the scope of the exception. *State v. Anderson*, 636 N.W.2d 26, 32 (Iowa 2001). The Code enumerates eleven categories of conduct that constitute "child abuse." Iowa Code § 232.68(2)(*a*). Each requires the abuse be at the hands of a person

"responsible for the care of the child." *Id.*[1] The Code defines "person responsible for the care of a child" to include:

> *a.* A parent, guardian, or foster parent.
>
> *b.* A relative or any other person with whom the child resides and who assumes care or supervision of the child, without reference to the length of time or continuity of such residence.
>
> *c.* An employee or agent of any public or private facility providing care for a child, including an institution, hospital, health care facility, group home, mental health center, residential treatment center, shelter care facility, detention center, or child care facility.
>
> *d.* Any person providing care for a child, but with whom the child does not reside, without reference to the duration of the care.

*Id.* § 232.68(8). Both parties acknowledge paragraph (*d*) is the only potentially applicable provision here.

Lindaman's argument regarding the statute is very technical. The day after the alleged abuse occurred, Ankeny police reported the incident in a "Suspected Child Abuse Reporting Form," which prompted the investigation, and ultimately, this proceeding. Lindaman argues that, whatever the name of the report, he did not commit child abuse within the meaning of the statute. According to him, he was only supervising H.K. and not "providing care for" her. Because he was not providing care for H.K., his acts did not constitute child abuse within the meaning of the statute and thus Anne's testimony about the injury to H.K. did not relate to a report of child abuse within the meaning of the exception.

We conclude his argument is unpersuasive. As used in this statute, providing care for a child describes the nature of the relationship between one

---

[1] The abusive conduct relevant here is "[t]he commission of a sexual offense with or to a child pursuant to chapter 709 . . . *as a result of the acts or omissions of the person responsible for the care of the child.*" Iowa Code § 232.68(2)(*a*)(3) (emphasis added).

person and another. In *State v. Anderson*, the defendant was a thirty-seven-year-old man who hired a fifteen-year-old girl to work on his farm during the summer. 636 N.W.2d at 29. Their relationship became sexual. *Id.* Anderson's ex-wife testified against him at trial, and he was convicted of statutory rape. *Id.* at 29–30. We concluded that the district court erred in allowing the ex-wife to testify against him. *Id.* at 38. "[T]he exception to the marital privilege under section 232.74 is limited to cases of child abuse that result from acts or omissions of a care provider. It does not apply to injuries to children that result from acts or omissions by a non-care provider." *Id.* at 36–37. Focusing on the nature of the relationship between the parties, we held that Anderson was not "responsible for the care of" the alleged victim because he was her employer and not her caretaker, so the child abuse exception did not apply. *Id.* at 34–37.

In contrast, it is clear that Lindaman was in a caretaker relationship with H.K. and was a "person providing care for a child" within the meaning of Iowa Code section 232.68(8)(*d*). Lindaman was H.K.'s grandfather. H.K. and her siblings regularly visited Lindaman, sometimes multiple times per week. Lindaman was often the only adult home with the grandchildren when they visited, and he was the only adult home with H.K. and her brother on the day of the alleged abuse. *See Doe v. Iowa Dep't of Hum. Servs.*, No. 16–0664, 2017 WL 1735647, at *2 (Iowa Ct. App. May 3, 2017) (finding sufficient evidence of the defendant's care provider status under Iowa Code section 232.68(8)(*d*) when the defendant was the only adult present in the first instance and again when the incident occurred in the defendant's home while the child was under his control). H.K.'s parents testified that they regularly entrusted the children to Lindaman's care. A report from the department of health and human services found

Lindaman "was providing for [H.K.'s] care and supervision while she was visiting in his home and is therefore considered a caretaker."

Despite his obvious role as a grandparent providing for the care of his grandchildren visiting him at his home, Lindaman insists he was not a caretaker of H.K. but was a mere supervisor of her. In support of the distinction, Lindaman relies on Iowa Code section 232.68(2)(*a*)(4)(a). That section defines one form of child abuse as "[t]he failure on the part of a person responsible for the care of a child to provide for the adequate food, shelter, clothing, medical or mental health treatment, supervision, or other care necessary for the child's health and welfare." *Id.* In Lindaman's view, because this statute uses the terms "care" and "supervision," they must be separate and distinct.

We find the argument unconvincing. Section 232.68(2)(*a*)(4)(a) sets forth different forms of child abuse that could be committed by someone responsible for the care of a child, but it does not define who is responsible for the care of a child. That definition is found in section 232.68(8), and we already have concluded that there was sufficient evidence to show Lindman was responsible for the care of H.K. at the time of the actions at issue. Further, while it is true that Lindaman may have only been supervising H.K. while she was with him at his house, that does not mean that Lindaman was not responsible for her care. Supervision describes one of the tasks associated with taking care of a child, not something separate and distinct from taking care of a child once a caretaker relationship has been established.

For these reasons, we conclude the district court did not err in allowing Lindaman's spouse to testify regarding the statements Lindaman made to her.

VI.

The State filed a cross-appeal to seek review of the district court's order granting Lindaman's motion to suppress statements he made to law enforcement officials. In the district court, Lindaman contended that his statements were obtained in violation of Iowa Code section 804.20. That statute provides that a peace officer shall permit a detained person to call, consult, or see a family member or attorney or both without unnecessary delay upon arrival at the place of detention. The district court found the investigating officers violated section 804.20 when they continued to interview Lindaman after he asked to make a phone call to his wife. The district court suppressed all of the statements Lindaman made to the officers after Lindaman requested to call his wife. Because this issue is material and likely to reoccur upon any retrial of this matter, we address it now. *See Dudley*, 856 N.W.2d at 679.

A.

Before addressing the merits of the district court's ruling, we must address a jurisdictional issue. Lindaman contends that the State does not have the ability to file a cross-appeal. According to Lindaman, the State can appeal as a matter of right in only those circumstances specified in Iowa Code section 814.5(1), and none of those statutory grounds for appeal as a matter of right are applicable here. Further, he notes, the Code authorizes the State to seek discretionary review from "[a]n order suppressing or admitting evidence." *Id.* § 814.5(2)(*b*). The implication from these two provisions, according to Lindaman, is that the State cannot file a cross-appeal and was required to file an application for discretionary review within thirty days of the district court granting the motion to suppress evidence. Because the State did not timely file an application for

discretionary review, he concludes, this court lacks jurisdiction over the State's cross-appeal.

Lindaman's jurisdictional challenge fails. This court has jurisdiction over cases, not issues. *See State v. Rutherford*, 997 N.W.2d 142, 144–45 (Iowa 2023) (explaining the difference between jurisdiction and authority); *State v. Wilbourn*, 974 N.W.2d 58, 66 (Iowa 2022) ("An appellate court either has jurisdiction over a criminal appeal or it does not."). This court obtained jurisdiction over this case when Lindaman filed his notice of appeal from the district court's judgment of conviction and sentence. Nothing in section 814.5 prohibits the State from filing a cross-appeal to raise additional issues and obtain additional relief once an appeal has been properly initiated by the defendant, and the state has routinely done so without any objection. *See, e.g., Trane v. State*, 16 N.W.3d 683, 699 (Iowa 2025) (reversing the district court's grant of a motion for new trial on the state's cross-appeal); *State v. Johnson*, 770 N.W.2d 814, 824–26 (Iowa 2009) (addressing the state's cross-appeal); *State v. Owens*, 635 N.W.2d 478, 484–87 (Iowa 2001) (same); *State v. Belt*, 505 N.W.2d 182, 184 (Iowa 1993) (same); *Becker v. Cent. States Health & Life Co. of Omaha*, 431 N.W.2d 354, 356 (Iowa 1988) ("Failure to cross-appeal on an issue decided adversely . . . forecloses . . . raising the issue on appeal."), *overruled on other grounds by, Johnston Equip. Corp. of Iowa v. Indus. Indem.*, 489 N.W.2d 13 (Iowa 1992); *State v. Goodson*, No. 18–1737, 2020 WL 3571803, at *9 n.13 (Iowa Ct. App. July 1, 2020) (declining to provide the state with greater relief on appeal because it did not file a cross-appeal). The State, like all other litigants, can file a cross-appeal to raise additional issues to the court in an attempt to obtain greater relief to the extent the request for greater relief is not prohibited by the constitution.

B.

Having concluded that the issue raised in the State's cross-appeal is properly before us, we turn to the merits of the district court's order suppressing Lindaman's statements to the investigating officers. "Our review of the district court's ruling on the motion to suppress is for the correction of legal error because the basis for the motion is statutory." *State v. Casper*, 951 N.W.2d 435, 437 (Iowa 2020). "If the district court applied the law correctly and substantial evidence supports the court's findings of fact, we will affirm the district court's ruling on a motion to suppress." *State v. Davis*, 922 N.W.2d 326, 330 (Iowa 2019). Otherwise, we will reverse.

Our analysis begins, as it must, with the statutory text. *Doe v. State*, 943 N.W.2d 608, 610 (Iowa 2020). Detainees in Iowa have a statutory right to contact a family member, an attorney, or both once the detainee reaches the place of detention. The statute provides:

> Any peace officer or other person having custody of any person arrested or restrained of the person's liberty for any reason whatever, shall permit that person, without unnecessary delay after arrival at the place of detention, to call, consult, and see a member of the person's family or an attorney of the person's choice, or both. Such person shall be permitted to make a reasonable number of telephone calls as may be required to secure an attorney. If a call is made, it shall be made in the presence of the person having custody of the one arrested or restrained. If such person is intoxicated, or a person under eighteen years of age, the call may be made by the person having custody. An attorney shall be permitted to see and consult confidentially with such person alone and in private at the jail or other place of custody without unreasonable delay. A violation of this section shall constitute a simple misdemeanor.

Iowa Code § 804.20.

The plain language of the statute requires only that the officer "permit" a detainee to make a call "without unnecessary delay" upon arriving at the place of detention. *Id.* To "permit" means "[t]o consent to formally; to allow (something)

to happen." *Permit, Black's Law Dictionary* 1374 (12th ed. 2024). Nothing in the text requires an officer to facilitate a phone call for a detainee or in any way assist a detainee in making such a phone call. The statute does provide that a person having custody of a detainee "may" make a phone call for an intoxicated person or a minor, but it does not require such person to do so. Iowa Code § 804.20.

The district court relied on *State v. Hicks*, 791 N.W.2d 89, 97 (Iowa 2010), in concluding that the officers did not permit Lindaman to make a call in violation of the statute. In *Hicks*, the defendant was arrested for driving while intoxicated and transported to the police department. *Id.* at 92. He was taken to a processing room where a phone was apparently available. *Id.* at 96. The defendant asked the officer, "Can I call somebody to get me out?" *Id.* at 92. The officer replied, "Yeah. I can let you make a call." *Id.* The conversation wandered, but the defendant returned to his request a few more times. *Id.* Each time, the officer told the defendant he could make a phone call but took no steps to facilitate the call. *Id.* We held this interaction violated the defendant's right under section 804.20. *Id.* at 96–97. We stated that "[b]ecause of the disparity in power between detaining officers and detained suspects during the detention process," police must "take affirmative action to ensure the request for a phone call is honored." *Id.* The officer should have gone further to "direct the detainee to the phone and invite the detainee to place his call or obtain the phone number from the detainee and place the phone call himself." *Id.* at 97. Relying on *Hicks*, the district court reasoned that the officers here did not direct Lindaman to the phone and affirmatively invite him to place his call.

The State attempts to distinguish *Hicks* on the ground that it involved an operating while intoxicated (OWI) offense with a potentially intoxicated person. OWI cases involving potentially intoxicated persons are different, according to

the State, because an intoxicated person may need help in making a phone call and because of the time pressure associated with obtaining a chemical test. Neither the statutory text nor our precedents support the distinction. "Iowa Code section 804.20 is a statute of general application," *State v. Moorehead*, 699 N.W.2d 667, 674 (Iowa 2005), and the statute "applies to all persons who have been arrested, not just persons arrested on suspicion of drunk driving," *State v. Starr*, 4 N.W.3d 686, 693 (Iowa 2024) (citing *State v. Sewell*, 960 N.W.2d 640, 645 (Iowa 2021)). Officers must permit detainees in all cases invoking the right to make a phone call without unnecessary delay upon arrival at the place of detention.

While we do not think *Hicks* is distinguishable for the reasons offered by the State, we do not find it controlling here. After *Hicks*, this court revisited the meaning of "permit" as used in section 804.20. In *State v. Lamoreux*, the defendant's attorney came to the jail and met with the defendant in a booking room equipped with audio and video recording devices. 875 N.W.2d 172, 174–75 (Iowa 2016). The defendant claimed the officers violated his right under section 804.20 to "be permitted to see and consult confidentially" with an attorney. *Id.* at 177 (quoting Iowa Code § 804.20 (emphasis omitted)). We explained that to "permit" means law enforcement must allow something to happen, not that law enforcement must ensure that it happens:

> The language of the statute thus appears to establish something that the attorney will be allowed to do, not something that must occur. It does not state that the attorney *shall see and consult* confidentially with a client in custody privately; instead it says this kind of consultation has to be permitted. "Permit" means to "grant leave for or the privilege of: ALLOW, TOLERATE." *Webster's Third New International Dictionary* 1683 (unabr. ed. 2002).

*Id.* We concluded there was no violation of the statute even though there was no confidential consultation where the attorney, who was aware of the recording

systems, "did not turn the audio off, cover the camera, or request another room." *Id.* at 180–81. "[T]he presence of the audio and camera monitoring would have been obvious to Lamoreux himself. Nothing in the record indicate[d] that Lamoreux's attorney was not 'permitted' to consult confidentially and in private with his client; rather, the attorney made a decision to go ahead and consult with his client without privacy." *Id.* at 181. The defendant was required to exercise some agency in exercising the statutory right, and he failed to do so. *See id.*

Most recently, in *State v. Clark*, we held law enforcement officials did not violate section 804.20 when officers retrieved the defendant's phone, placed it next to her, and gestured toward the phone as they told her multiple times that she could make a call in response to her statements that she wanted an attorney. 21 N.W.3d 429, 437 (Iowa 2025). We explained that "[t]he deputies only needed to *permit* Clark to have a reasonable opportunity to make a phone call." *Id.* The officers did not have a duty to specifically direct her to make the call. *Id.* Nor did the officers have a duty to exercise the right on the detainee's behalf. *Id.*

Officers cannot prevent detainees from making a call under section 804.20. *See Starr*, 4 N.W.3d at 693 (affirming a section 804.20 violation where the officer flatly denied the detainee's request to make a call). Nor may officers play semantics by telling a detainee she can make a phone call while withholding or not providing any means to execute the call. That is, in effect, no different than preventing a phone call. *See State v. Lyon*, 862 N.W.2d 391, 401 (Iowa 2015) ("[W]e have insisted that law enforcement officers not play games when faced with a request from a person in custody to communicate with the outside world after being arrested."); *Didonato v. Iowa Dep't of Transp.*, 456 N.W.2d 367, 371 (Iowa 1990) ("[W]hen a request to make a phone call is made

we do not believe the statutory purpose is met if the officer stands mute and refuses the request."). But once a detainee knows she may make a call and has the means to carry out the call at her fingertips, the detainee must exercise some agency to actually make the requested phone call. *See Clark*, 21 N.W.3d at 437.

The *Clark* decision better interprets and applies the statute than the older *Hicks* decision. *Hicks* took an overly broad view of what the statute required. While the statute imposes duties on peace officers to permit a detained person to make a phone call without unnecessary delay upon arrival at the detention center, it nowhere imposes a duty on peace officers to facilitate the phone call. Reading that requirement into the statute was improper. The statute regulates peace officer conduct with respect to detained persons, but it also imposes criminal liability on police officers who do not comply with the statute. *See* Iowa Code § 804.20 (making it a simple misdemeanor to violate the statute). We are obligated to interpret this criminal statute fairly and not interpret the statute to encompass conduct "outside the fair scope and intent of [the] statute's terms." *State v. Koplin*, 402 N.W.2d 423, 425 (Iowa 1987). Our prior cases concluding that peace officers had a duty to facilitate a phone call for a detained person greatly expanded the fair scope of this statute. Think of the issue this way: a peace officer could not be held criminally liable for denying permission to make a call by placing an unhandcuffed detainee in a soft interview room next to a phone and phone book and telling the detainee he could definitely make a call. No reasonable person could consider that to be the denial of permission to make a phone call.

The district court did not have the benefit of our *Clark* decision when it ruled on Lindaman's motion to suppress, but we think *Clark* compels the conclusion that the district court erred here. Once Lindaman arrived at the

interview room, he faced directly toward the phone while he was being uncuffed. He was told he could "definitely make a phone call." As the officer informed Lindaman that he could make a phone call, the officer gestured toward the phone and phone book, which were next to Lindaman. The phone and phone book remained within arm's reach for the duration of the interview. Lindaman was then left alone in the interview room with the phone and phone book for nearly an hour, during which time he continued to fiddle with the phone book, but he never made a call. Lindaman's failure to exercise agency and act on the permission given him does not constitute a violation of the statute.

VII.

Finally, we address Lindaman's alternative argument that the district court should have suppressed his confession because law enforcement officers violated his constitutional right to counsel. Lindaman contends that when he was arrested, he invoked his right to have counsel present during questioning. Despite this invocation, he argues, the officers did not scrupulously honor his request but instead cajoled him into reinitiating the conversation, rendering his subsequent *Miranda* waiver invalid. Although the district court suppressed the confession on statutory grounds, it rejected this constitutional claim. We conclude the district court was correct to do so.

The law governing this issue is well established. Under the Fifth and Fourteenth Amendments to the United States Constitution, an individual subject to custodial interrogation has the right to consult with an attorney and to have the attorney present during questioning. *See Miranda v. Arizona*, 384 U.S. 436, 469–73 (1966). If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. *Id.* at 474. The Supreme Court established a bright-line, prophylactic rule to protect this right: once an

accused has invoked the right to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981).

Thus, our analysis involves two steps. First, we must determine whether Lindaman, after invoking his right to counsel, was subjected to further police interrogation or whether he voluntarily reinitiated the dialogue. *See Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983). An accused reinitiates conversation when his comments "evince[] a willingness and a desire for a generalized discussion about the investigation." *Id.* at 1045–46. Second, if the accused did reinitiate the conversation, we must then ask whether he knowingly and intelligently waived the right he had invoked. *See Smith v. Illinois*, 469 U.S. 91, 95 (1984) (per curiam); *Bradshaw*, 462 U.S. at 1045–46.

The record of Lindaman's arrest, captured on bodycam video, provides a clear sequence of events. When officers first approached Lindaman at the auto service center, they asked if he would be willing to talk about the allegations. In response, Lindaman stated, "I'd probably like to have my lawyer present." The officers immediately ceased any attempt at questioning and informed Lindaman he was under arrest. As they were handcuffing him, an officer stated, "If you at any time change your mind, and you wish to speak to us, we're willing to talk to you. Okay?" Lindaman did not respond to this statement. The officers then informed him they were executing a search warrant at his home and asked if he had questions about that. Lindaman then asked, "You mean talk to you right now instead of . . . what are the options?" And moments later, "If I talk to you now, . . . I don't have to go to the police station?" An officer correctly informed

him that he would be taken to the station regardless. Crucially, the officer then reminded Lindaman of his rights, stating they would like to talk to him, "but . . . you asked for an attorney." It was only after this exchange that Lindaman stated, "I can talk to you right now, I guess." The officers did not question him right away but instead took him to the police station. Once at the station, the officers read Lindaman the *Miranda* advisories, and he waived his rights.

Applying the controlling law to these facts, we find no constitutional violation. Lindaman's initial statement that he would "probably like to have [his] lawyer present" was, at minimum, an equivocal request for counsel that the officers rightly treated as a full invocation, and they scrupulously honored it by immediately ceasing their efforts to engage him in conversation about the case. The subsequent statement that they would be "willing to talk" if he changed his mind was not interrogation; it was a neutral statement of fact that did not call for an incriminating response.

It was Lindaman who reinitiated the dialogue. His questions about his "options" and whether talking would change his immediate fate were not routine inquiries about custody; they were questions that evinced a desire to engage in a "generalized discussion about the investigation." *Bradshaw*, 462 U.S. at 1045–46. Even then, the officers did not press their advantage. Instead, they reminded Lindaman that he had already invoked his right to counsel, giving him a clear opportunity to stand by his initial choice. He chose a different path. Having made his own choice to reopen the door to conversation, his subsequent written waiver of his *Miranda* rights at the police station was knowing and voluntary. *See id.* The district court correctly found no constitutional violation.

## VIII.

For these reasons, we vacate Lindaman's conviction and sentence, and we remand this matter for further proceedings consistent with this opinion.

**Affirmed in Part, Reversed in Part, and Case Remanded.**

Oxley, McDermott, and May, JJ., join this opinion. Oxley, J., files a concurring opinion, in which McDermott, J., joins, and Waterman, J., joins as to part I. Waterman, J., files a dissenting opinion, in which Christensen, C.J., joins. Mansfield, J., takes no part.

**Oxley, Justice (concurring).**

I.

I write separately to reiterate what I said in *State v. Clark*: "Iowa Code section 804.20 require[s officers] to honor [a detainee's] requests to speak to her attorney [or family member] by giving her an actual opportunity to make the phone call." 21 N.W.3d 429, 440 (Iowa 2025) (Oxley, J., dissenting). That means "providing the time or means to do so." *Id.* When we said in *State v. Hicks* that police must "take affirmative action to ensure the request for a phone call is honored," 791 N.W.2d 89, 96–97 (Iowa 2010), we meant that police must allow the call to happen. And if that involves some level of facilitation—by directing the defendant to a phone in the room, providing a phone if there isn't one in the room, or stopping an interview long enough to allow the call to be made—then facilitation is required. In *Hicks*, we didn't allow officers to give a wink and a nod to a defendant's request to make a call under section 804.20 without giving the defendant a real opportunity to do so, *see id.* ("Requiring a suspect with restrained liberty to affirmatively pick up a police department's telephone and contact family or counsel without invitation from the detaining officer transforms section 804.20 into an illusory statutory right."), and I don't read the majority to allow that here.

The majority is correct that *Hicks* is not controlling on these facts. Lindaman had an "actual opportunity," *Clark,* 21 N.W.3d at 440 (Oxley, J., dissenting), to call his wife if he had really wanted to. The phone and a phone book were sitting next to him, within reach, when the officer told him he could "definitely make a phone call" as she was walking out of the room. Unlike in *Clark*, where the officers continued to ask Clark questions and placed a paper

over her cellphone while they continued the informed consent process to its completion despite her repeated requests to call her attorney, *id.* at 438–39, Lindaman had ample opportunity to make a call while the officers were attending to other matters. He simply chose not to.

Because *Hicks* is not controlling on these facts, i.e., it is distinguishable, we need not—and should not—call into question its holding that an officer may be required, in certain circumstances, to take an active role in permitting a detainee to exercise his statutory right to call his attorney or a family member. *See* 791 N.W.2d at 97.

## II.

With that caveat about *Hicks*, I join the remainder of the majority's opinion.

McDermott, J., joins this concurrence, and Waterman, J., joins as to part I of this concurrence.

**Waterman, Justice (dissenting).**

I respectfully dissent from part III of the majority opinion and its continuing affront to young victims of unspeakable crimes who are brave enough to testify against their abusers. I would affirm Lynn Lindaman's conviction for sexually abusing his seven-year-old granddaughter. I agree with the majority's rejection of Lindaman's challenges to his conviction in parts II (sufficiency of the evidence) and V (marital communication privilege), and with its reversal of the district court ruling suppressing Lindaman's confession under Iowa Code section 804.20 (2023). And in my view, none of Lindaman's other challenges bypassed by the majority merit a new trial.

**I. The Confrontation Clause.**

The majority errs by holding that the district court violated Lindaman's confrontation rights under article I, section 10 of the Iowa Constitution when it allowed his granddaughter to testify against him by one-way video. The majority repeats the unforced error it made last year in *State v. White*, 9 N.W.3d 1 (Iowa 2024).

The granddaughter's therapist opined, and the district court found, that being in the same room as Lindaman would traumatize the child. Lindaman does not challenge that finding. The essential purpose of the confrontation clause was satisfied because Lindaman and the jury saw and heard his victim's live testimony and watched one of his experienced attorneys, who was in the same room as the child, conduct a face-to-face cross-examination. This procedure complied to the letter with Iowa Code section 915.38, and—until the majority's decision in *White*—it complied with our interpretation of article I section 10 of the Iowa Constitution and the United States Supreme Court's analysis of the

identically worded Federal Confrontation Clause.[2] *See Maryland v. Craig*, 497 U.S. 836, 860 (1990); *Pitts v. Mississippi*, 607 U.S. \_\_\_, \_\_\_, 2025 WL 3260171, at \*2 (Nov. 24, 2025) (per curiam); *In re J.D.S.*, 436 N.W.2d 342, 346–47 (Iowa 1989) (en banc), *overruled by*, *White*, 9 N.W.3d 1. No other state has declined to follow *Maryland v. Craig* and allow remote testimony by child witnesses when construing a similarly worded state confrontation clause. As the majority acknowledged in *White*, "Iowa 'stands alone.' " 9 N.W.3d at 11. Alone it remains.

I would accept the State's invitation to overturn *White* today for the reasons explained in Chief Justice Christensen's dissent, *id.* at 15–20 (Christensen, C.J., dissenting, joined by Waterman and Mansfield, JJ.), and for additional reasons discussed below. *White* and today's opinion rely on a flawed historical understanding of the confrontation clause that downplays the fundamental role of cross-examination and overemphasizes the secondary importance of a face-to-face showdown. *White* and today's decision disregard compelling reasons to adhere to the national constitutional consensus and to pre-*White* Iowa precedent. Finally, the majority today, as it did in *White*, inexplicably leaves open

---

[2]The Sixth Amendment to the United States Constitution provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; *to be confronted with the witnesses against him*; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

(Emphasis added.) Article I, section 10 of the Iowa Constitution provides:

> In all criminal prosecutions, and in cases involving the life, or liberty of an individual the accused shall have a right to a speedy and public trial by an impartial jury; to be informed of the accusation against him, to have a copy of the same when demanded; *to be confronted with the witnesses against him*; to have compulsory process for his witnesses; and, to have the assistance of counsel.

(Emphasis added.)

the question of whether their newly crafted regime would permit *two*-way video live testimony.

Fortunately, the majority's erroneous interpretation of Iowa's confrontation clause is likely to be short-lived. As soon as 2028, the Iowa legislature is expected to put before Iowa voters a clarifying amendment that effectively overrules *White* and this case.[3] Unfortunately, until that happens, Lindaman's granddaughter and other abused children and disabled adults will suffer when they are forced to be in the courtroom with their abusers. Still other victims will not receive justice when prosecutors drop cases to spare them that additional trauma.

Our court nearly four decades ago correctly interpreted Iowa's confrontation clause in *In re J.D.S.,* 436 N.W.2d at 346–47. We favorably quoted Justice O'Connor's concurrence in *Coy v. Iowa,* which recognized that the Constitution allows narrowly circumscribed exceptions to the general requirement for face-to-face confrontations:

> The protection of child witnesses is, in my view and in the view of a substantial majority of the States, just such a policy. The primary focus therefore likely will be on the necessity prong. I agree with the Court that more than the type of generalized legislative finding of necessity present here is required. But if a court makes a case-

---

[3]To amend the Iowa Constitution, the proposed amendment must be passed by two separate general assemblies and then placed on the ballot in the next general election and approved by a majority of voters. Iowa Const. art. X, § 1. In 2025, in reaction to *White*, the Iowa House and Senate voted overwhelmingly in favor of Senate Joint Resolution 9 to amend article I of the Iowa Constitution by adding this new section:

> Sec. 10A. Protection of children and other witnesses. To protect children under the age of eighteen and any witness with a mental illness, intellectual disability, or other developmental disability, the right of an accused to confront such witnesses may be limited by law.

S.J.R. 9, 91st G.A., 1st Sess. § 1 (Iowa 2025). This resolution passed the senate by a vote of 47–0 with three members absent and passed the house by a vote of 87–6 with seven members absent or abstaining. S. Journal, 91st G.A., 1st Sess., at 581–82 (Iowa 2025); H. Journal, 91st G.A., 1st Sess., at 966–67 (Iowa 2025). The next general assembly convenes in January 2027. If the proposed amendment is approved a second time, it would go on the ballot in November 2028.

specific finding of necessity, as is required by a number of state statutes, our cases suggest that the strictures of the Confrontation Clause may give way to the compelling state interest of protecting child witnesses. Because nothing in the Court's opinion conflicts with this approach and this conclusion, I join it.

*Id.* at 345 (quoting *Coy v. Iowa,* 487 U.S. 1012, 1025 (1988) (O'Connor, J., concurring)). We went on to hold that the use of a one-way mirror, which allowed the accused to see his accuser but not vice versa, satisfied the Confrontation Clause of both the Federal *and* Iowa Constitutions. *Id.* at 347. We explained:

By enacting [the predecessor to section 915.38], the legislature [evinced] its belief that protection of child witnesses is an important public policy. The trial court found and, by our de novo review, we agree that the screening procedure employed in this case was necessary to protect [the child] and comported with the statutory purpose. We also find the procedure to be reasonable and hold that it did not violate [the accused's] right of confrontation under the federal or Iowa constitutions.

*Id.* Importantly, we found that the accused "was given an opportunity for effective cross-examination" of the victim. *Id.* at 348.

The very next year, the Supreme Court confirmed the constitutionality of such procedures in *Craig,* holding that the child sex abuse victim's testimony by one-way closed-circuit television complied with the Sixth Amendment's Confrontation Clause. 497 U.S. at 860. Iowa's compelling state interest in protecting children from trauma has not waned in the ensuing thirty-five years, and section 915.38's procedure is narrowly tailored to accommodate the defendant's right of confrontation.

The majority today and in *White* gives short shrift to *Craig*'s sound reasoning. The majority opinion today never even mentions *Craig.* And *White* never directly confronted its reasoning; instead, *White* devoted nine paragraphs to arguing why our court can depart from decisions of the highest court in the land applying identically worded constitutional provisions. Just because we can

interpret the Iowa Constitution differently does not mean we should do so in these cases.

In *Craig*, the Supreme Court held that a child's testimony by closed-circuit television would satisfy the Confrontation Clause only when the state demonstrated a compelling interest in protecting the witness from trauma:

> [W]e hold that, if the State makes an adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant.

*Id.* at 855. The Supreme Court made clear it requires case-specific findings that the child would be harmed by testifying in the personal presence of the defendant:

> The requisite finding of necessity must of course be a case-specific one: The trial court must hear evidence and determine whether use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify. The trial court must also find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant. Denial of face-to-face confrontation is not needed to further the state interest in protecting the child witness from trauma unless it is the presence of the defendant that causes the trauma. . . . Finally, the trial court must find that the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis* . . . .

*Id.* at 855–56 (citations omitted). If the requisite findings of necessity are made, then the child may testify remotely under procedures that *Craig* required to be narrowly tailored to protect the defendant's confrontation rights:

> In sum, we conclude that where necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate, the Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the

evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation.

*Id.* at 857.

*Craig* upheld Maryland's statutory procedure with the child testifying by one-way closed-circuit television because that method "preserves all of the other elements of the confrontation right: The child witness must . . . testify under oath; the defendant retains full opportunity for contemporaneous cross-examination; and the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies." *Id.* at 851. The same was true in *White* and in Lindaman's trial. *Craig* remains the controlling authority under the Sixth Amendment,[4] and I would follow it under article I, section 10 of the Iowa Constitution.

On November 24, 2025, a unanimous Supreme Court effectively reaffirmed *Craig* and reiterated that "the Sixth Amendment tolerates screening in child-abuse cases only if a court 'hear[s] evidence' and issues a 'case-specific' finding of '[t]he requisite . . . necessity.' " *Pitts,* 607 U.S. at ___, 2025 WL 3260171, at *2 (alterations in omission in original) (quoting *Craig,* 497 U.S. at 855). In *Pitts v. Mississippi,* the Supreme Court reversed a decision of the Mississippi Supreme Court that allowed a four-year-old victim of sexual abuse to testify behind a screen at trial without the requisite findings by the trial court. *Id.* at ___, 2025 WL 3260171, at *3. That is not what happened in Lindaman's

---

[4]*White* acknowledged questions whether *Craig* has been undermined by *Crawford v. Washington*, 541 U.S. 36 (2004), but correctly "continue[d] to view *Craig* as binding precedent for purposes of *federal* rights under the Sixth Amendment to the United States Constitution." *White*, 9 N.W.3d at 11. *Crawford* emphasized that the Confrontation Clause requires an opportunity to cross-examine the declarant before admitting into evidence an out-of-court testimonial statement. 541 U.S. at 68. Lindaman's granddaughter was cross-examined by defense counsel face-to-face during her live testimony at trial, satisfying *Crawford.* In any event, *Pitts v. Mississippi*, 607 U.S. ___, 2025 WL 3260171, dispelled any question whether *Crawford* undermined *Craig*. It did not. *See id.* at ___, 2025 WL 3260171, at *2 (unanimously applying *Craig*).

case. The district court overseeing Lindaman's case indisputably made the specific findings that *Craig* requires.

*Craig* and *Pitts* make clear that face-to-face testimony is a strong constitutional *preference*, and the exceptions are narrowly tailored and based on the compelling state interest in protecting children from unnecessary trauma. Our court errs by elevating the constitutional preference for face-to-face confrontation into an *absolute* requirement.

Neither Lindaman nor the majority challenge the district court's factual findings and ruling that the statutory requirements of section 915.38 were satisfied. The counselor treating Lindaman's granddaughter opined that the child would likely be traumatized by testifying in his presence:

> This goes into a trauma response. And a trauma response sets the stage for continued trauma responses, meaning she can go back and regress into nightmares, new nightmares, bed wetting, thumb sucking. Behaviors that are going to hinder her development.

The child suffered nightmares about Lindaman as the trial date approached. The counselor described "the increased risk that [the child] runs being [seated] right in front of [Lindaman], having him look right at her as she's asked to speak of him." The district court determined that the statutory requirements for remote testimony were met:

> The Court finds that, based on [the counselor's testimony], that testifying in the physical presence of the Defendant would be traumatic for the minor victim . . . . The emotional distress the child would suffer from being in the same room as the Defendant is significant and certainly more than *de minimus*. The negative impacts of that distress would likely last long after the trial has concluded. The use of closed circuit testimony is necessary to protect this child. The Court also finds the testimony is more likely to be reliable if the child is not placed in the mental state that would occur from seeing the Defendant.

Those unchallenged factual findings satisfy the requirements for remote testimony under Iowa Code section 915.38, *Craig, J.D.S.*, and the great weight of authority nationwide allowing one-way[5] or two-way video[6] procedures.

---

[5]*See Reutter v. State*, 886 P.2d 1298, 1305, 1311 (Alaska Ct. App. 1994) (applying *Craig* to reject state and federal constitutional challenge to statute and allowing one-way video testimony from a child complaining witness); *People v. Phillips*, 315 P.3d 136, 149–53 (Colo. App. 2012) (applying the *Craig* factors to allow a child witness to testify by closed-circuit television despite a Colorado constitutional provision requiring face-to-face confrontation); *State v. Arroyo*, 935 A.2d 975, 992 (Conn. 2007) (applying *Craig* to uphold the admission of a complaining witness's videotaped testimony that had been filmed while the defendant looked on "from behind a one-way mirror"); *Figueroa v. State*, 388 So. 3d 132, 135–37 (Fla. Dist. Ct. App. 2023) (applying *Craig* and holding that "the trial court did not err in allowing the child to testify via CCTV"); *Lavalley v. State*, 892 S.E.2d 803, 807 (Ga. Ct. App. 2023) (applying *Craig* and concluding that "the court's decision to allow B. J. to testify via one-way closed circuit television was . . . necessary to protect B. J.'s welfare"); *State v. Baeza*, 383 P.3d 1208, 1212–13 (Idaho 2016) (upholding the district court's admission of a child's testimony over a closed-circuit television and relying on *Craig*); *People v. Franklin*, 229 N.E.3d 364, 376–86 (Ill. App. Ct. 2023) (applying *Craig* to uphold a trial court's admission of testimony taken on a closed-circuit system); *Johnson v. Commonwealth*, 718 S.W.3d 597, 614 (Ky. 2025) ("Based on our precedent, we continue to interpret our Confrontation Clause as equal to that in the Sixth Amendment and will apply the *Craig* test."); *State v. Hamed*, 326 So. 3d 375, 381 (La. Ct. App. 2021) (confirming that *Craig* can apply when the standards are met); *People v. Jemison*, 952 N.W.2d 394, 400 (Mich. 2020) (en banc) ("We will apply *Craig* only to the specific facts it decided: a child victim may testify against the accused by means of one-way video (or a similar *Craig*-type process) when the trial court finds, consistently with statutory authorization and through a case-specific showing of necessity, that the child needs special protection."); *State v. Smith*, 922 N.W.2d 444, 459, 461–62 (Neb. 2019) (following *Craig* under the Nebraska Constitution); *State v. Smith*, 730 A.2d 311, 318 (N.J. 1999) (applying *Craig* to uphold the admission of one-way video testimony); *State v. Moen*, 26 N.W.3d 560, 563–66 (N.D. 2025) (applying *Craig* to uphold the admission of video testimony where the district court found that the witness would be unduly traumatized if testifying face-to-face); *State v. Saunders*, 245 N.E.3d 889, 905 (Ohio Ct. App. 2024) (applying *Craig* under both the Ohio and Federal Constitutions to permit one-way video testimony despite a face-to-face clause in the Ohio Constitution); *Commonwealth v. Willliams*, 84 A.3d 680, 682 n.2 (Pa. 2014) (noting amendment to state constitution was intended to permit remote testimony by child witnesses); *State v. Lewis*, 478 S.E.2d 861, 863–66 (S.C. Ct. App. 1996) (per curiam) (applying *Craig* to one-way video testimony); *State v. Henriod*, 131 P.3d 232, 238 (Utah 2006) (finding *Craig* controls when analyzing whether a child may testify via closed-circuit television); *State v. Foster*, 957 P.2d 712, 714, 727 (Wash. 1998) (holding testimony by child sex abuse victims by one-way closed-circuit television satisfied both the Sixth Amendment and the state constitution, which contains a face-to-face confrontation clause); *State v. Vogelsberg*, 724 N.W.2d 649, 654–55 (Wis. Ct. App. 2006) (concluding *Crawford* and *Craig* address different confrontation issues, and upholding use of a barrier between the defendant and child witness under *Craig*).

[6]*See Bragg v. State*, 390 So. 3d 578, 580–85 (Ala. Crim. App. 2023) (applying *Craig* to uphold a conviction where the complaining witnesses testified by two-way video from another country); *State ex rel. Montgomery v. Kemp*, 371 P.3d 660, 666 (Ariz. Ct. App. 2016) ("We adopt the *Craig* test, and applying it to this case, conclude that Davis's confrontation rights can be satisfied through the use of two-way video testimony."); *People v. Lujan*, 150 Cal. Rptr. 3d 727, 732 (Ct. App. 2012) (applying *Craig* to allow two-way video testimony and holding that "child witnesses shown to be traumatized by face-to-face confrontation may testify remotely without violating a defendant[']s Confrontation Clause rights, whether or not those witnesses are victims

In *White*, our court not only departed from *Craig*'s well-settled federal precedent; it also overruled our own precedent construing article I, section 10: *J.D.S.* 436 N.W.2d at 346–47. *See White*, 9 N.W.3d at 12. The *White* court justified its departure from stare decisis simply by noting the accused in *J.D.S.* relied on Sixth Amendment precedent without offering "an independent interpretation of the Iowa Constitution." *Id.* (emphasis omitted). But reliance on Sixth Amendment precedent makes perfect sense when construing identical language in the Iowa Constitution. As the three dissenting justices in *White* observed, more should be required to overrule our longstanding precedent interpreting the Iowa Constitution:

> "Stare decisis alone dictates continued adherence to our precedent absent a compelling reason to change the law." *Book v. Doublestar Dongfeng Tyre Co.*, 860 N.W.2d 576, 594 (Iowa 2015). The majority disregards stare decisis by over-ruling *J.D.S.* without any compelling reason to do so. I would honor stare decisis and follow *J.D.S.*

*Id.* at 17–18 (Christensen, C.J., dissenting).

---

of an independent crime committed by that defendant"); *White v. State*, 116 A.3d 520, 544 (Md. Ct. Spec. App. 2015) ("Accordingly, we hold that the *Craig* standard applies when the State seeks to present witness testimony via two-way video conference against a defendant in a criminal proceeding."); *Newson v. State*, 526 P.3d 717, 720–23 (Nev. 2023) (en banc) (applying *Craig* to uphold two-way testimony under the Federal and Nevada Constitutions); *State v. Thomas*, 376 P.3d 184, 194–95 (N.M. 2016) ("We adopt the *Craig* standard here in our analysis of the admissibility of two-way video testimony."); *People v. Cintron*, 551 N.E.2d 561, 567, 570 (N.Y. 1990) (holding that "face-to-face confrontation with the defendant is not an absolute requirement under either the Federal or State Constitution" and rejecting a facial challenge to a statute allowing two-way video testimony of child sex abuse witnesses); *State v. Seelig*, 738 S.E.2d 427, 429, 432, 434–36 (N.C. Ct. App. 2013) (applying *Craig* to reject a State and Federal Confrontation Clause challenge to testimony by "live, two-way, closed-circuit internet broadcast"); *Marx v. State*, 987 S.W.2d 577, 580–81 (Tex. Crim. App. 1999) (en banc) (applying *Craig* to find no Confrontation Clause violation in the admission of two-way closed-circuit television testimony); *State v. Bergquist*, 211 A.3d 946 , 963–68 (Vt. 2019) (applying *Craig* to uphold the constitutionality of two-way video testimony); *Castillo v. Commonwealth*, 827 S.E.2d 790, 817–20 (Va. Ct. App. 2019) (viewing *Craig* as allowing necessity-based exception for face-to-face confrontation and upholding use of two-way video); S*tate v. Herbert*, 767 S.E.2d 471, 482 n.15 (W. Va. 2014) (noting that two-way live video may satisfy *Craig* and should be considered to secure appearance from a recalcitrant witness); *Bush v. State*, 193 P.3d 203, 214–16 (Wyo. 2008) (applying *Craig* to uphold a conviction where an out-of-state, medically incapacitated witness testified by video teleconference).

Not only did *White* provide no compelling reason to overrule *J.D.S.*, but it also flouted the state's reliance interest underlying the doctrine of stare decisis. *See Berry v. State*, ___ A.3d ___, ___, 2025 WL 2639971, at *7 (Del. Sep. 15, 2025) (en banc) (Rejecting an argument to overturn precedent under the Confrontation Clause, stating: "*Stare decisis* protects the interests of parties in the judicial system, who act in reliance on precedent. Those reliance interests are especially strong in criminal cases. Merely disagreeing with the reasoning or holding of a previous case is not grounds to revisit it. This Court is particularly chary to overturn precedent where, as here, the only change is the court's composition." (footnote omitted)); *Burnett v. Smith*, 990 N.W.2d 289, 303–04 (Iowa 2023) ("We are hesitant to overrule a precedent where a significant reliance interest has developed.")

In many other Iowa trials, the state had relied on *Craig* and *J.D.S.* to allow victims to give live but remote testimony against their abuser when an appropriate record had been made under Iowa Code section 915.38. *White* scrapped that reliance interest by requiring retrials in multiple sex abuse cases— trials that will retraumatize the victims. And *White* undermined the finality of every conviction where counsel could have raised a facial challenge to remote testimony under article I, section 10. Yet *White* overruled *J.D.S.* without even mentioning the state's reliance interest in protecting victims. *White* and today's majority opinion are wrongly decided and are causing harm. We can and should overrule cases that erroneously departed from our longstanding precedent. *See, e.g.*, *Burnett*, 990 N.W.2d at 297–98.

The majority raises a new argument today to justify *White*'s unwarranted overruling of *J.D.S.* The majority now contends that allowing remote testimony violates the defendant's presumption of innocence by making "a preliminary

finding of guilt." I disagree. The district court did not disclose to the jury that it found the child would be traumatized by being in the same room as her grandfather. The jury determines guilt. The jury was properly instructed on the State's burden to prove guilt beyond a reasonable doubt. This new "presumption of innocence" argument is unmentioned in *White*. It is not supported by any case on point. No other court has adopted it. And in *Pitts*, the Supreme Court reiterated that "*Craig*'s exception for child-abuse cases" applies regardless of whether the perpetrator's identity is contested. 607 U.S. at __, 2025 WL 3260171, at *2. Lindaman never raised this presumption of innocence argument at trial or in his appellate briefing, although he protested that allowing only the child to testify remotely signaled judicial special treatment to his detriment. The trial judge offered to give a limiting instruction to the jury; Lindaman did not request one. Lindaman's presumed innocence does not foreclose his granddaughter's remote testimony.

The majority's selective history of the right of confrontation skips over the most important aspects of its origin story. "The primary object of the [Confrontation Clause] was to prevent depositions or ex parte affidavits . . . being used against the prisoner in lieu of a personal examination and cross-examination of the witness . . . ." *Mattox v. United States*, 156 U.S. 237, 242–43 (1895); *see also Crawford v. Washington*, 541 U.S. 36, 50 (2004) ("First, the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused."). *Crawford v. Washington* reviewed English cases and nineteenth century treatises describing the Anglo-American history of confrontation. 541 U.S. at 42–48. *Crawford* discussed cases commonly cited as formative, including the trial of Sir Walter Raleigh, who was convicted of

treason—and ultimately executed—on the affidavit of one Lord Cobham. *Id.* at 44. *Crawford* also discussed the trial in *The King v. Paine* (1696) 87 Eng. Rep. 584 (KB), where ex parte affidavits were read into the record, the affiant having died before the trial. *Crawford,* 541 U.S. at 45–46. As the court noted in *Paine,* the "depositions should not be given in evidence, the defendant not being present when they were taken before the mayor, and so *had lost the benefit of a cross-examination.*" 87 Eng. Rep. at 585 (emphasis added).

Indeed, it is the "*opportunity of cross-examination*" that is the "main and essential purpose of confrontation." *Davis v. Alaska,* 415 U.S. 308, 315–16 (1974) (quoting 5 John Henry Wigmore, *Wigmore on Evidence* § 1395, at 123 (3d ed. 1940) [hereinafter Wigmore, *Wigmore on Evidence* (1940)]). And we have reached the same conclusion under article I, section 10 of the Iowa Constitution. *State v. Castillo,* 315 N.W.2d 63, 65–66 (Iowa 1982) ("The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." (quoting 5 Wigmore, *Wigmore on Evidence* (1940) § 1395, at 123)). As the Ohio Supreme Court reiterated,

> The Confrontation Clauses were written into our Constitutions "*to secure for the opponent the opportunity of cross-examination.* The opponent demands confrontation, not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers."

*State v. Self,* 564 N.E.2d 446, 450 (Ohio 1990) (quoting 5 John Henry Wigmore, *Wigmore on Evidence* § 1395, at 150 (Chadbourn rev. 1974) [hereinafter Wigmore, *Wigmore on Evidence* (1974)]). In *State v. Self,* the Ohio Supreme Court held that both the Sixth Amendment and the Ohio confrontation clause permitted using "a child sexual abuse victim's videotaped deposition at trial in place of live testimony." *Id.* at 453. The court reached that conclusion even

though the Ohio Constitution is worded to require face-to-face confrontation. *Id.* at 452. The *Self* court explained,

> [A] criminal defendant is ordinarily entitled to a physical confrontation with the accusing witnesses in the courtroom. Yet, the value which lies at the core of the Confrontation Clauses does not depend on an "eyeball to eyeball" stare-down. Rather, the underlying value is grounded upon the opportunity to observe and to cross-examine. The physical distance between the witness and the accused, and the particular seating arrangement of the courtroom, are not at the heart of the confrontation right.

*Id.* The Ohio Supreme Court correctly applied timeless principles to the new technology allowing remote, live video testimony:

> While closed-circuit television and videotape recording did not exist when the Ohio (or federal) Constitution was written and adopted, these new technologies, when employed in accord with R.C. 2907.41, provide a means for the defendant to exercise the right of cross-examination and to observe the proceedings against him with the same particularity as if he and the witness were in the same room. In no sense is the defendant barred from questioning the witness or the proceeding converted to a secret or "Star Chamber" affair.

*Id.* at 452–53.

The Supreme Court has "never held, however, that the Confrontation Clause guarantees criminal defendants the *absolute* right to a face-to-face meeting with witnesses against them at trial." *Craig*, 497 U.S. at 844. "[A] literal reading of the Confrontation Clause would 'abrogate virtually every hearsay exception, a result long rejected as unintended and too extreme.' " *Id.* at 848 (quoting *Ohio v. Roberts*, 448 U.S. 56, 63 (1980), *overruled by*, *Crawford*, 541 U.S. 36). "[W]e have never insisted on an actual face-to-face encounter at trial in *every* instance in which testimony is admitted against a defendant." *Id.* at 847 (noting face-to-face confrontation "is not the *sine qua non* of the confrontation right").

The *Craig* Court emphasized the importance of a full and fair opportunity to cross-examine the accuser. *See id.* at 847. That requirement was undeniably met here. One of Lindaman's lawyers was personally present with the child witness and, as Lindaman's agent, conducted his *face-to-face* cross-examination of her while the other defense lawyer was in the courtroom with Lindaman. Lindaman, through his two lawyers, had a full and fair opportunity to cross-examine his accuser. Neither Lindaman nor the majority claim his lawyer's cross-examination was hindered or incomplete because Lindaman was in another room with cocounsel at the time.

Focusing on cross-examination as the soul of confrontation makes intuitive sense. After all, cross-examination "is beyond any doubt the greatest legal engine ever invented for the discovery of truth." 5 Wigmore, *Wigmore on Evidence* (1974) § 1367, at 32. *White* erroneously relied on older Iowa cases extolling "face-to-face" confrontations. 9 N.W.3d at 7 (citing *State v. Reidel*, 26 Iowa 430, 437 (1868); *State v. Collins*, 32 Iowa 36, 40 (1871)). Those cases merely held that affidavits could not be substituted for live testimony. *Reidel*, 26 Iowa at 437; *Collins*, 32 Iowa at 40. The majority today and in *White* commits a variation of the *post hoc ergo propter hoc* fallacy: it correctly notes that face-to-face confrontation and cross-examination historically occurred together, then it extrapolates—wrongly in my view—to the position that both forms of confrontation are constitutionally mandated. Thunder comes during rainstorms; it does not follow that thunder requires rain. That video testimony was not used in 1871 tells us more about technology than it does about constitutional interpretation. *See Self*, 564 N.E.2d at 452–53. As the State observes, remote video testimony did not exist when those cases were decided, so those nineteenth century cases can hardly be said to have preemptively rejected live remote video

testimony under the Iowa confrontation clause a century and a half later. That issue simply was not adjudicated back then.

The framers of the Iowa Constitution chose language for our state confrontation clause identical to its federal counterpart and thereby presumably intended the same meaning, as we determined in *J.D.S.*, 436 N.W.2d at 347. *See generally State v. Warren*, 955 N.W.2d 848, 859 (Iowa 2021) ("We ordinarily 'interpret the scope and purpose of the Iowa Constitution . . . to track with federal interpretations . . . ' due to their nearly identical language . . . ." (quoting *State v. Brown*, 930 N.W.2d 840, 847 (Iowa 2019))); *Brown*, 930 N.W.2d at 846 ("There is also evidence in the 1857 debates over the Iowa Constitution that our framers wanted our bill of rights to provide similar protection to the Federal Bill of Rights when they adopted similar language."). There is no historical evidence that the framers of the Iowa Constitution intended a different meaning for confrontation rights than the Sixth Amendment.

By contrast, "[t]he New Hampshire Constitution provides that an individual accused of a crime 'shall have a right . . . to meet the witnesses against him *face to face.*' " *State v. Warren*, 337 A.3d 265, 272 (N.H. 2025) (omission in original) (emphasis added) (quoting N.H. Const. pt. I, art. 15). The New Hampshire Constitution adopted that language in 1784, modeling its version after the Massachusetts Declaration of Rights enacted in 1780, which contained the same face-to-face provision. *Id.* at 273. The Iowa framers could have expressly required face-to-face confrontation like those states but instead used the language of the Sixth Amendment without that phrase. We assume the framer's omissions are intentional and give them effect. *See, e.g., State v. Hauge*, 973 N.W.2d 453, 464 (Iowa 2022) (distinguishing out of state precedent relying on an express constitutional right to privacy not found in the Iowa Constitution).

Many other state constitutions include the "face-to-face" phrase in their confrontation clauses. *See State v. Foster*, 957 P.2d 712, 722 n.7 (Wash. 1998) (en banc) (collecting provisions). Iowa did not. It is not our role to rewrite article I, section 10 to add "face-to-face." The pending constitutional amendment will restore our prior interpretation of article I, section 10 in *J.D.S.* to once again allow remote testimony by children and disabled adults on an appropriate record.

Words matter. At one time, both the Illinois and Pennsylvania Constitutions expressly recognized the right of the accused to meet witnesses "face to face." And, the supreme courts of both states held that face-to-face confrontation was essential to their constitutions. *See People v. Fitzpatrick*, 633 N.E.2d 685, 687 (Ill. 1994) (citing Ill. Const. art. I, § 8 (1970)); *Commonwealth v. Ludwig*, 594 A.2d 281, 283–85 (Pa. 1991) (citing Pa. Const. art. I, § 9 (1984)). In the wake of those decisions, both states amended their constitutions to remove the "face-to-face" language, and without that phrase, appellate courts in both states subsequently rejected confrontation clause challenges to statutes like Iowa Code section 915.38. *See People v. Franklin*, 229 N.E.3d 364, 377–81 (Ill. App. Ct. 2023) (upholding constitutionality of a statute allowing certain disabled adults to testify by closed-circuit television); *Commonwealth v. Willliams*, 84 A.3d 680, 682 n.2 (Pa. 2014) ("[T]he amendment was designed to permit the enactment of laws or the adoption of rules that would permit child victims or witnesses to testify in criminal proceedings outside the physical presence of the accused.").

The Washington Constitution has the face-to-face phrase in its confrontation clause, yet the Washington Supreme Court interpreted it to permit child abuse victims to testify by one-way closed-circuit television upon

appropriate factual findings. *Foster*, 957 P.2d at 714, 727. A Colorado appellate court reached the same conclusion under that state's confrontation clause that includes the "face-to-face" phrase and applied *Craig* to permit a child witness to testify by closed-circuit television. *People v. Philips*, 315 P.3d 136, 149–53 (Colo. App. 2012). So, too, did the Ohio Supreme Court in *Self*. 564 N.E.2d at 452–53.

*White* also relied on nineteenth century cases from Georgia, Louisiana, and New York to support the proposition that the "right of face-to-face confrontation was acknowledged in other states' cases from the same period." 9 N.W.3d at 7. But *White* failed to acknowledge that today, appellate courts in Georgia and Louisiana permit a child to testify via one-way closed-circuit television, and New York courts allow two-way closed-circuit testimony under circumstances satisfying *Craig*. *See Lavalley v. State*, 892 S.E.2d 803, 807–08 (Ga. Ct. App. 2023) (applying *Craig* to determine that a child's testimony via one-way closed-circuit television was proper); *State v. Day*, 253 So. 3d 173, 182–83 (La. Ct. App. 2018) (same); *People v. Cintron*, 551 N.E.2d 561, 567 (N.Y. 1990) (rejecting facial challenge under the State and Federal Constitutions to a statute allowing two-way video testimony of child witnesses in sex abuse cases).

So, what about two-way video in Iowa? Remarkably, the majority today still leaves that question open, as it did in *White*, 9 N.W.3d at 14. This poses a dilemma for prosecutors and victim rights advocates over whether to risk another retrial by allowing otherwise recalcitrant child victims to testify by two-way video. I would not bet that this court ultimately would allow two-way video without a constitutional amendment. The State's experienced appellate counsel at oral argument in this case swung for the fences without arguing in the alternative that two-way video is constitutional even if one-way is not. *White* said this:

> At a minimum, face-to-face confrontation requires that trial witnesses must be *both* visible to the accused *and also* able to see

the accused. Two-way visibility—the ability to see each other—is inseparable from the idea of a face-to-face confrontation. So when the witness and the accused are prevented from seeing each other, there can be no face-to-face confrontation, and the Iowa Constitution cannot be satisfied.

*Id.* at 8–9. The *White* majority clearly saw two-way video testimony as resting on a stronger constitutional footing than one-way video, yet today the majority again declines to answer whether two-way video would comply with its interpretation of article I, section 10. What Chief Justice Christensen said in protest in *White* rings doubly true today:

> Finally, the majority's refusal to decide the actual appeal before us amounts to an abdication of responsibility. White contends that *only* in-person confrontation satisfies the Iowa Constitution. Meanwhile, the majority concludes that the use of a one-way video system violates the Iowa Constitution, but it does not decide whether a two-way video system complies with the Iowa Constitution. In short, the majority is not giving White what he asks for while also guaranteeing another appeal if he gets less than he asks for. Why isn't the majority deciding the entire case? Surely the majority doesn't think it needs more briefing on article I, section 10 or that new insights may emerge. Does the majority anticipate that some new authoritative treatise on the 1857 Iowa Constitution will be published between now and a potential second appeal? I doubt that will occur.
>
> The majority protests that the "record does not describe an actual two-way system." The majority turns a blind eye to the fact that we are all very familiar with two-way video systems, having been through the changes wrought by the COVID-19 pandemic. The majority knows what is possible with two-way video and should either approve such a procedure or indicate that the in-person appearance of a child witness is always required.
>
> This is exactly the type of remand that a trial court judge dreads. A third trial would further traumatize the child witnesses. At a minimum, I would hold two-way video on this record does not violate the defendant's confrontation rights under the Iowa Constitution. *See, e.g.*, *State ex rel. Montgomery v. Kemp*, 239 Ariz. 332, 371 P.3d 660, 666 (Ariz. Ct. App. 2016) (adopting *Craig* under the Arizona Constitution and approving use of a two-way video system).

*Id.* at 20 (Christensen, C.J., dissenting).

We compared one-way and two-way video testimony in *State v. Rogerson* and held that *Craig* applied to both. 855 N.W.2d 495, 504 (Iowa 2014). We determined the state failed to satisfy *Craig*'s necessity prong and declined to permit the prosecution to present the testimony of lab technicians or nonresident adult car accident victims by two-way video. *Id.* at 507. But we "concede[d]" that "two-way videoconferencing technology available today more closely approximates face-to-face confrontation than one-way video." *Id.* at 504. And we recognized that *Craig* governs "when to permit child victims of abuse to testify via one-way video systems." *Id.* at 500 (emphasis omitted). We approvingly cited our own precedent under the Sixth Amendment where "we employed the *Craig* standard and permitted a minor sexual abuse victim to testify via closed-circuit television because the State presented evidence that the child would suffer emotional trauma if he were required to testify in the defendant's presence." *Id.* at 500–01 (citing *State v. Rupe*, 534 N.W.2d 442, 443–44 (Iowa 1995)). We should use the same approach under article I, section 10 of the Iowa Constitution, as we did in *J.D.S.*

**II. Lindaman's Other Arguments for a New Trial.**

The majority does not reach Lindaman's remaining arguments for a new trial. Because I would affirm the district court's denial of Lindaman's motion for a new trial, I will address those arguments.

**A. Venue.** Lindaman argues that, because pretrial publicity made it impossible for him to receive a fair trial by an impartial jury in Polk County, the district court abused its discretion by denying his motion to transfer the case to another venue. I disagree. We review rulings on motions to transfer venue by examining "the record de novo and, on that basis, determine whether the trial

court abused its discretion." *State v. Dorsey*, 16 N.W.3d 32, 41 (Iowa 2025) (quoting *State v. Love*, 302 N.W.2d 115, 122 (Iowa 1981) (en banc), *overruled on other grounds by, State v. Reeves*, 636 N.W.2d 22 (Iowa 2001)). Lindaman had to show that there was: "(1) publicity attending the trial that is so *pervasive and inflammatory* that prejudice must be presumed, or (2) actual prejudice on the part of the jury." *Id.* at 42 (quoting *State v. Siemer*, 454 N.W.2d 857, 860 (Iowa 1990)). The court must find there is "a substantial likelihood a fair and impartial trial cannot be preserved with a jury selected from the county" where the crime occurred. Iowa R. Crim. P. 2.11(11). Lindaman failed to make the requisite showing to change venue.

Lindaman relied on stale information about press coverage of his case that had tapered off by the time of trial. Questionnaires given to jury pools showed "less than 20 percent" of prospective jurors had heard anything about his case. He conceded the questionnaires "don't show a high number of individuals that would know about this case." The district court correctly proceeded to voir dire to determine whether Lindaman could get a fair trial. *See Dorsey*, 16 N.W.3d 32 at 45 (noting that "relying on stale information" to change venue without voir dire is an abuse of discretion). "Voir dire is a critical part of determining whether an impartial jury can be selected in the county of the offense." *Id.* at 44. "Voir dire of prospective jurors should be trusted to expose any substantial prejudices among the jurors." *Id.* (quoting *State v. Ware*, 338 N.W.2d 707, 713 (Iowa 1983)).

Voir dire supported the court's ruling to keep the case in Polk County. The several jurors who had heard about the case were excused for cause in an abundance of caution. The jurors who were seated said they lacked any news exposure to the case. The court instructed them to avoid news coverage during the trial. Lindaman points to no evidence that any juror saw news coverage

during the trial. Lindaman failed to meet the "demanding standard" for a change of venue. *Id.* at 45.

**B. Prosecutorial Misconduct.** Lindaman contends the prosecutor crossed the line in preparing the child victim to testify. Lindaman extrapolates from the child's use of the word "vagina" at trial to the conclusion that the prosecutor improperly told her what to say. Before trial, the victim had simply referred to her "private part" or "heinie." He argues this rises to the level of a *Brady* violation, to be reviewed de novo. *State v. Cahill*, 972 N.W.2d 19, 27 (Iowa 2022). This claim fails. The record shows the child learned the word "vagina" from her father after the prosecutor asked her on the record if she knew the word. The district court correctly found that "helping an eight-year-old learn a particular word is not the same as insisting that she use that word or alter her testimony in any way." There was no misconduct. *See DeVoss v. State*, 648 N.W.2d 56, 64 (Iowa 2002) ("If by 'coaching,' DeVoss means the prosecutor went over Maggio's testimony with her, the claim simply has no merit."); *Owens v. State*, No. 22–1359, 2024 WL 960455, at *3 (Iowa Ct. App. Mar. 6, 2024) (holding that a prosecutor "educat[ing] the complaining witness on what the term 'private part' meant" was "not impermissible coaching" and thus "the prosecutor did not commit misconduct when preparing the child to testify").

**C. Denial of a Mistrial**. Lindaman argues that he was entitled to a mistrial when his granddaughter testified that "my mom said that [Lindaman] was a bad man when she was little and it was not for my ears." The prosecutor responded, "We're not going to talk about any of that stuff, okay?" The prosecutor stated on the record that she had "no knowledge" of such a conversation between the victim and her mother and it was an entirely unexpected answer. Lindaman conceded at the time that the prosecutor "did a good job of trying to move along

from that statement." And his appellate brief "duly note[s] that the prosecutor promptly attempted to deflect the examination away from the problematic testimony." Lindaman nevertheless moved for a mistrial, arguing that his granddaughter's testimony suggested that Lindaman had abused his daughter. The trial court denied the motion as requiring a "leap in logic," but offered a cautionary instruction, which Lindaman declined.

Lindaman argues the court abused its discretion in denying a mistrial. I disagree. Lindaman must show that the unprompted answer resulted in prejudice that prevented him from having a fair trial. *State v. Callender*, 444 N.W.2d 768, 770 (Iowa Ct. App. 1989). "Generally, an admonition to the jury to disregard inadmissible testimony is sufficient to cure any prejudice," and Lindaman declined the court's offer of such an admonition. *Id.* Lindaman relies on *State v. Belieu*, 288 N.W.2d 895 (Iowa 1980), but that case is readily distinguishable. There, the witness gave detailed inadmissible testimony of three unrelated crimes (a robbery, a theft, and a burglary), which Belieu had previously committed, to show that he forced her to participate in the crime at issue, and the prior crimes were "pervasive and central to the defenses" that codefendants argued to the jury. *Id.* at 901. That is a far cry from the cryptic, stray comment challenged here. *See State v. Newell*, 710 N.W.2d 6, 32–33 (Iowa 2006) (determining trial court did not abuse its discretion in denying a motion for mistrial after a witness made a "solitary reference" to defendant's unrelated drug charge, when "considered in the context of the entire trial and all the properly admitted evidence").

None of the foregoing arguments entitles Lindaman to a new trial.

For these reasons, I dissent from part III of the majority opinion.

Christensen, C.J., joins this dissent.